UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

NORTHEAST BUILDERS SUPPLY　　　　　　　:
& HOME CENTERS, LLC,　　　　　　　　　　:
　　　Plaintiff,　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　:
v.　　　　　　　　　　　　　　　　　　　　　:　　　3:15-cv-00549-WWE
　　　　　　　　　　　　　　　　　　　　　　:
MEMBER INSURANCE AGENCY, INC.,　　　　:
and　　　　　　　　　　　　　　　　　　　　:
PENNSYLVANIA LUMBERMENS　　　　　　　:
MUTUAL INSURANCE COMPANY,　　　　　　:
　　　Defendants.　　　　　　　　　　　　　　:

# MEMORANDUM OF DECISION
# ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

This is an action by an insured business against its insurance broker and its insurer after a fire destroyed retail and storage facilities containing personal property and equipment. The insurance policy at issue allegedly failed to provide adequate building, personal property and equipment coverage and lacked coverage for "extra expense" or business income interruption.

Plaintiff Northeast Builders Supply & Home Centers, LLC, alleges (1) negligence, (2) misrepresentation, (3) breach of fiduciary duty, and (4) violation of the Connecticut Unfair Trade Practices Act against defendants Member Insurance Agency, Inc., and Pennsylvania Mutual Insurance Company. Defendants have each moved for summary judgment. For the following reasons, defendants' motions will be granted in part and denied in part.

## BACKGROUND

The following background was gleaned from the parties' statements of fact, affidavits, deposition transcripts, and other exhibits.

Northeast Builders Supply & Home Centers, LLC, is a multi-location lumber and hardware wholesaler and retailer with its principal place of business located at 1460 Barnum Avenue, Bridgeport, Connecticut.

Member Insurance was established in 1972, and provides insurance products for the retail, hardware, lumber, and building materials industry.

Before 2009, Northeast procured commercial insurance through Member Insurance.

Beginning in 2009, Northeast procured insurance through David Kelly, of the Bouvier Insurance Agency. Since 2009, Northeast's insurance carrier was Acadia.

Regarding prior coverages provided to Northeast by Acadia, the parties dispute whether plaintiff's Cornwall Bridge and Grove Street locations had coverage for items such as business income loss and extra expense. Northeast maintains that its prior policies are not material to its claims in the instant case, as plaintiff alleges it requested blanket loss income and extra expense coverage for all locations.

Northeast's principal, Jan Cohen, was a practicing certified public account in the state of Connecticut for approximately ten years before leaving the accounting profession to begin a career developing real estate. When he worked as a CPA at Caposella Cohen, Mr. Cohen performed audits for two lumber companies one of which, Bridgeport Lumber, he would later acquire. Mr. Cohen began his first real estate development business, 340 Orange Street, with his partner, Arnie Foster. Mr. Cohen and Mr. Foster met at Capossela Cohen in 1982 when Mr. Foster was hired as a computer consultant. Mr. Cohen began buying commercial real estate and operating his real estate business while he was still working as a CPA at Capossela Cohen.

Mr. Cohen testified that over the years he and Mr. Foster have owned approximately 25 business entities. By 1990, Mr. Cohen entered the lumber and building materials business in addition to real estate development. Mr. Cohen had previously purchased real estate with a lumber

business on it in 1988.  Mr. Cohen and Mr. Foster have operated that lumber business, Bridgeport Lumber, continuously since its purchase in 1988.  Bridgeport Lumber became Northeast Builders Supply.  Mr. Cohen testified that he is Northeast's Chief Financial Officer and co-CEO.  In addition to supervising and managing most of Northeast's real estate holdings, Mr. Cohen supervises the accounting department and makes management decisions with Mr. Foster.

Mr. Cohen also testified that it has been his responsibility to negotiate and acquire policies of insurance for Northeast.

Northeast disputes that Mr. Cohen's professional experience as a CPA or his role at Northeast of negotiating and acquiring insurance for the company bears any relevance.  Plaintiff submits that Mr. Cohen, as an insured, is not sophisticated in commercial insurance and the procurement of such insurance.  Member Insurance, as a broker, has the expertise in insuring the commercial lumber industry and had the responsibility of properly quoting and procuring coverage for Northeast's risk.  Northeast contends that it was appropriate for Mr. Cohen to trust and rely on Member Insurance to properly quote and procure insurance coverage for Northeast.

On October 7, 2013, Greg Cooper, a Member Insurance Account Executive, emailed plaintiff's principal, Jan Cohen, to submit a bid for plaintiff's commercial insurance.  Jan Cohen instructed his assistant, Jessica Mandujano, to get the information that Mr. Cooper requested, so he could bid the insurance.

Shortly after Jan Cohen directed Ms. Mandujano to provide the requested information to Mr. Cooper, Mr. Cooper emailed Jan Cohen again and asked, "Jan, before we move forward, has anything changed since last year?  I certainly do not want to waste your time."

Mr. Cohen responded three minutes later: "Our loss ratios for comp have come way down.  Nothing has changed and we make no claims."

3

Mr. Cooper responded five minutes later, "[w]ill you allow us to use Pennsylvania Lumbermens this year? If not, I don't see a reason to move forward."

Two minutes later, Mr. Cohen responded, "Yes go ahead." Four minutes later, Mr. Cooper responded, "OK, I will move forward with PLM for your 1/1 renewal. They should be able to provide competitive alternative to Acadia this year. I work closely with their field underwriter, Sheila."

Two minutes later, Mr. Cohen responded: "I will be at do it [Do It Best Corp. show] on the 18th . . . If you can provide significant savings we will change."

On Wednesday, October 2, 2013, Jessica Mandujano sent Greg Cooper the expiring policy that was provided through the Acadia Insurance Company as well as Northeast's recent loss run and related requested information.

That same day, Greg Cooper emailed Jan Cohen a draft "Broker of Record Letter" to allow Member Insurance to work exclusively with PLM.

In his email to Jan Cohen, Mr. Cooper commented that Member Insurance's relationship with PLM "is among the best as we both concentrate on writing the same types of Business (Lumber and Building Materials). We will also look into our own program to see if we will be competitive on specific lines of coverage."

Jan Cohen executed the Broker of Record Letter on behalf of Northeast on October 2, 2013.

The Broker of Record Letter appointed Member Insurance as Northeast's "exclusive broker" with respect to all its policies with PLM.

When asked if his decision to change insurers was contingent entirely on price, Mr. Cohen responded: "The context of that answer is that I'm supposed to receive the insurance I'm supposed to receive. And apples to apples, the price has to be less."

4

On December 17, 2013, Joseph Fuegel emailed Greg Cooper with a copy of the PLM Proposal. The PLM Proposal "designed for Northeast Builders Supply & Home Centers, LLC" with an effective date of January 7, 2014 bore the "created date" of December 17, 2013.

Mr. Cooper and Mr. Cohen met on December 19, 2013, at plaintiffs Bridgeport, Connecticut location. Mr. Cooper testified that he discussed the PLM Proposal with Mr. Cohen, and that the meeting lasted 15 or 20 minutes. The parties dispute the nature of the December 19, 2013 discussion, specifically as to whether there was confirmation of blanket coverage for all of Northeast's buildings.

On December 30, 2013 at 3:03 p.m., Greg Cooper emailed Jan Cohen the final premium summary, indicating that he had removed 4 vehicles as requested, attached a side-by- side premium comparison with the expiring policy.

On Monday, December 30, 2013, at 4:54 p.m., Greg Cooper emailed his co-workers that he got the Northeast account.

On December 31, 2013, at 8:41 a.m., Greg Cooper emailed his co-workers at Member Insurance to bind coverage for Northeast, effective 1/1/2014.

On December 31, 2013 at 3:32 p.m. Greg Cooper emailed Jan Cohen, attaching his Auto ID cards and binder for his records.

Northeast submits that the binder and was received without any explanation of its contents or the adequacy of the coverage that the binder purported to reflect.

Member contends that Northeast never expressed concerns about coverage, but Northeast disputes that assertion.

Prior to the fire loss, Mr. Cohen himself never reviewed the PLM policy to review Northeast's coverages.

5

On January 12, 2015, a fire destroyed the buildings and much of the personal property and equipment at 44 Kent Road, Cornwall Bridge.

## DISCUSSION

A motion for summary judgment will be granted where there is no genuine issue as to any material fact and it is clear that the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir.), cert. denied, 502 U.S. 849 (1991).

The burden is on the moving party to demonstrate the absence of any material factual issue genuinely in dispute. American International Group, Inc. v. London American International Corp., 664 F.2d 348, 351 (2d Cir. 1981). In determining whether a genuine factual issue exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

If a nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof, then summary judgment is appropriate. Celotex Corp., 477 U.S. at 323. If the nonmoving party submits evidence which is "merely colorable," legally sufficient opposition to the motion for summary judgment is not met. Anderson, 477 U.S. at 249.

**Claims against PLM (the insurer)**

PLM argues that there was no agreement between PLM and Member establishing an agency relationship. Moreover, there *is* an express agreement between Northeast and Member establishing that Member was a broker working for Northeast. PLM further contends that it never provided any authority to Member to do anything other than submit applications like any other broker; PLM

6

never took control of Member's conduct or relationships with applicants.  See Hallas v. Boehmke and Dobosz, Inc., 239 Conn. 658, 675 n. 16 (1997):

> We decline, moreover, to hold that a broker may become an agent for an insurer simply by collecting and remitting premiums for the insurer's ultimate benefit. To the extent that the language in *Passarello* or *Teleco Oilfield Services, Inc.,* adopts this proposition, we reject it as a matter of state law. To do otherwise would effectively make agents out of all independent insurance brokers.

In addition, PLM argues that it owed no fiduciary duty to Northeast.  In the context of uninsured motorist coverage, the Supreme Court of Connecticut has declined to attach fiduciary obligations to an insurer based merely upon arm's-length contract:

> The contractual nature of insurance and the commercial relationship between insurer and insured are not altered by any peculiarities of uninsured motorist coverage. "The relationship between the insured and the insurer clearly is *contractual* in nature, and we find nothing in [the uninsured motorist statute] that alters the traditionally commercial setting in which insurance policies are purchased. Our [uninsured motorist] statute creates no fiduciary obligations.

Harlach v. Metropolitan Property and Liability Ins. Co., 221 Conn. 185, 190 (1992) (emphasis original).  Indeed, "[i]n deciding other claims for breach of fiduciary duty between an insurer and insured, Connecticut courts have consistently held that no fiduciary duty arises when an insurer sells a policy to an insured." Northwestern Mut. Life Ins. Co. v. Gil, 2009 WL 276086 at *6 (D. Conn. Feb. 5, 2009).

Next, PLM argues that, had no common law duty of care, in this case to evaluate Northeast's insurance needs or to correct any perceived deficiency in the coverage sought.  PLM points out that it had no direct communication with Northeast about the policy that was purchased; all communication went through the broker.  PLM submits that it did not make any misrepresentations to Northeast.

Finally, PLM argues that none of its actions amount to a breach of CUTPA.  Indeed, Northeast has not alleged any violation of the Connecticut Unfair Insurance Practices Act ("CUIPA").  See State v. Acordia, Inc., 310 Conn. 1, 37 (Conn. 2013) ("Because CUIPA provides

7

the exclusive and comprehensive source of public policy with respect to general insurance practices, we conclude that, unless an insurance related practice violates CUIPA or, arguably, some other statute regulating a specific type of insurance related conduct, it cannot be found to violate any public policy and, therefore, it cannot be found to violate CUTPA.").

Northeast responds that the existence of an agency relationship is a question of fact, and PLM and Member had an unusually close working relationship. Moreover, Northeast contends that when Member pitched PLM as an insurer to Northeast in October 2013, it cited the unique working relationship between Member and PLM as a primary selling point.

Northeast acknowledges that the normal relationship between an insured and its carrier does not present a fiduciary relationship. Nevertheless, Northeast argues that the special circumstances of this case do not foreclose the existence of such a relationship.

> In this case, however, the fiduciary relationship arose from direct contact with Northeast Builders through trade shows and the dissemination of the Proposal, all of which predated the Policy. PLM represented itself to be uniquely qualified to provide insurance to Northeast Builders because it understood the lumber and hardware business and the need for and complexities of commercial insurance coverage. Under such circumstances, a jury could reasonably find a fiduciary relationship existed between Northeast Builders and PLM.

Pl.'s Resp. 39. [ECF No. 104].

The Court finds that the contact between Northeast and PLM at trade shows and through the insurance proposal is not sufficient to establish a fiduciary relationship. Northeast has not provided any case law supporting the existence of a fiduciary duty based on such limited contact. Indeed, Northeast has not provided case law holding an insurer liable to an insured based on breach of a fiduciary duty under *any* circumstances.

Similarly, under the instant circumstances, no reasonable jury could find PLM liable for misrepresentation or for common law negligence. Summary judgment will be granted on these claims and on Northeast's CUTPA claim against PLM.

**Claims against Member (the broker)**

"[The insurance broker] is the agent of the insured in negotiating for the policy. As such he owes a duty to his principal to exercise reasonable skill, care, and diligence in effecting the insurance, and any negligence or other breach of duty on his part which defeats the insurance which he undertakes to secure will render him liable to his principal for the resulting loss. Where he undertakes to procure a policy affording protection against a designated risk, the law imposes upon him an obligation to perform with reasonable care the duty he has assumed, and he may be held liable for loss properly attributable to his default. The principal may sue either for breach of the contract or in tort for breach of duty imposed by it." Ursini v. Goldman, 188 Conn. 554, 173 A. 789, 791 (1934).

Member argues that Northeast simply asked Member to provide a package of "apples to apples" coverage, and that is what Member did. But Northeast alleges at a minimum that Member misled it into thinking that its buildings had blanket coverage. Member Insurance responds that it merely followed Northeast's instructions to procure a package of insurance that was similar to the prior expiring policy, yet the new policy, as Member puts it, "does not blanket coverage the same way" as the prior policy did. In other words, the new policy did not provide blanket coverage, at all. Gregory Cooper was questioned at deposition about the issue of blanket insurance.

> Q: So when you told Mr. Cohen that Pennsylvania Lumbermens is not blanketed the same way that Acadia does, what did you say specifically and what did he say back to you?
>
> A: He said that he wanted blanket, and I said, we can't offer blanket the way you have it now. We have to make sure that every building content and BI limit is accurate for each location, this is how it's presented. This is how Pennsylvania Lumbermens Mutual does it, so that was discussed.

9

> Q: But if you look at what is in the proposal for building – for property 5, location 5, buildings 1 and 2, there is no BI?
>
> A: Correct, because the current policy didn't have BI applied to locations 4 and 5. That is the only reason it's not there.
>
> Q: Did you explain that to Mr. Cohen; did you tell him that?
>
> A: Not specifically. How it was explained was, make sure all of the limits and coverages on the property section are accurate. That was not blanketed, it was communicated a few times.
>
> \* \* \*
>
> Q: And that was my question: Did you ask Mr. Cohen what personal property is located at each location and what is its value?
>
> A: I did not specifically ask that.
>
> Q: Did you ask as to the buildings that existed on locations 1 through 5, what are those buildings used for?
>
> A: I didn't ask that question.

Nevertheless, on Monday, December 30, 2013, Cooper emailed his co-workers at Member Insurance to inform them that he got the Northeast Builders account. On December 31, 2013, Cooper emailed his co-workers to bind coverage for Northeast, effective January 1, 2014.

On December 31, 2013, Cooper sent an email to co-workers requesting a statement of values ("SOV") for Northeast to sign so that they could have the insurance blanketed. Yet Member Insurance never obtained or submitted a signed POV.

On January 12, 2015, a fire destroyed the buildings housing the retail and storage facilities along with personal property and equipment at Northeast's Cornwall Bridge Property.

The court finds material factual issues genuinely in dispute as to whether Member acted with reasonable care regarding the duty it assumed to secure adequate and proper insurance coverage. Accordingly, the Negligence claim against Member will survive.

The court similarly finds that Northeast's misrepresentation claim presents genuine factual disputes, namely as to whether Member was to provide "blanket coverage" or the equivalent. Accordingly, summary judgment will be denied as to Northeast's misrepresentation claim against Member.

Considering the survival of the above two claims for trial, the court will also deny summary judgment on the issue of fiduciary duty. Under well-established Connecticut law, "a fiduciary or confidential relationship is characterized by a unique degree of trust and confidence between the parties, one of whom has superior knowledge, skill or expertise and is under a duty to represent the interests of the other." Murphy v. Wakelee, 247 Conn. 396, 400 (1998). Because the Supreme Court has "specifically refused to define a fiduciary relationship in precise detail and in such a manner as to exclude new situations . . ." Alaimo v. Royel, 188 Conn. 36, 47 (1952), the issue of whether a fiduciary relationship exists between an insured and an insurance broker as a question of fact. Putnam Resources v. Frenkel & Co., Inc., 1993 WL 286782, at *3 (Conn. Super. Ct. Jul. 20, 1993) ("It has been noted that because of the increasing complexity of the insurance industry and the specialized knowledge required to understand all of its intricacies, the relationship between the insurance agent and his client is often a fiduciary one."). Accordingly, summary judgment will be denied as to Northeast's claim against Member.

Nevertheless, Northeast's professional negligence based claims do not give rise to a cause of action under CUTPA; only the entrepreneurial or commercial aspects of the profession are covered by the Act. Haynes v. Yale New Haven Hospital, 243 Conn. 17, 34 (1997). CUTPA is implicated against a professional "when the actions at issue are chiefly concerned with 'entrepreneurial' aspects

11

of practice, such as the solicitation of business and billing practices, as opposed to claims directed at the 'competence of and strategy' employed by the . . . defendant." Janusauskas v. Fichman, 264 Conn. 796, 809 (2003). The professional malpractice exception has been extended to claims against insurance agents and brokers. See O&G Indus. v. Litchfield Ins. Grp., Inc., 2016 WL 3451962, at *6-7 (Conn. Super. Jun. 2, 2016) (collecting cases). "The majority of trial courts to consider the issue have held that a claim against an insurance broker or agency alleging professional negligence *without more* is barred by the professional services exception to CUTPA." Id. at *7 (emphasis original). Finally, CUTPA requires a plaintiff to show more than a single act of insurance conduct, as isolated instances of misconduct are not sufficient to establish a claim. Accordingly, summary judgment will be granted in favor of Member as to Northeast's CUTPA violation claim.

## CONCLUSION

For the foregoing reasons, defendants' motions for summary judgment are GRANTED in part and DENIED in part. Summary judgment is granted as to all claims against PLM and as to the CUTPA claim against Member. Northeast's claims of negligence, misrepresentation, and breach of fiduciary duty against Member remain.

Dated this 28th day of August, 2018, at Bridgeport, Connecticut.

     /s/Warren W. Eginton
     WARREN W. EGINTON
     SENIOR UNITED STATES DISTRICT JUDGE